IN THE UNITED STATES DISTRICT COURT
FOR EASTERN DISTRICT OF VIRGINIA
Richmond Division



IN THE MATTER OF THE )
SEARCH OF INFORMATION )
ASSOCIATED WITH THE ) Case No. 3:21-sw-171
CELLULAR DEVICE ASSIGNED )
CALL NUMBER (804) 546-6064, )
IMEI# 352180108937578, THAT IS )
STORED AT PREMISES )
CONTROLLED BY AT&T )
Corporation. )
)
)
)

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, **Mark G. Jones**, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.  I make this affidavit in support of an application for a search warrant for information associated with a certain cellular telephone assigned call number **(804) 546-6064**, with **IMEI# 352180108937578** ("SUBJECT PHONE"), that is stored at premises controlled by **AT&T Corporation**, a wireless telephone service provider headquartered at 208 South Akard Street, Dallas, Texas 75202. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) to require **AT&T Corporation** to disclose to the government copies of the information further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review the information to locate items described in Section II of Attachment B.

2. Your affiant has been employed as a Special Agent with the U.S Department of Justice-Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) since March of 2005 and is currently assigned to the FBI's Central Virginia Violent Crimes Task Force (CVVCTF). Your affiant has led and/or participated in numerous felony criminal investigations/arrests in the Commonwealth of Virginia, the Federal Western District of North Carolina, and the Federal Eastern District of Virginia. These cases have included multiple narcotics and/or firearms violations, which are included in Titles 18 and 21 of the United States Code. Your affiant has authored several search and seizure and arrest warrants in connection with these investigations.

3. Your affiant graduated from the Basic Criminal Investigator's Training Program at the Federal Law Enforcement Training Center (F.L.E.T.C), in Glynco Georgia. The training provided at F.L.E.T.C included extensive coursework and practical exercises in Constitutional Law, Criminal Law, Fourth Amendment Law, Federal Court Procedures, Conspiracies and Parties thereto, Self-Incrimination, and Physical Evidence.

4. Your affiant also graduated from the ATF "Special Agent Basic Training" (S.A.B.T), in Glynco, Georgia. The training provided during S.A.B.T included extensive coursework and practical exercises in: Firearms Technology, Law, and Trafficking; Interview/Interrogation; Explosives Investigation and Law; Arson Investigation and Law; Alcohol and Tobacco Diversion; and Complex Investigation Management.

5. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, law enforcement officers and witnesses. This affidavit is intended to show simply that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 2119, 18 U.S.C. §924 (c), and 18 U.S.C. §922 (g)(1) have been committed by **Treon C. JACKSON**.[1] There is also probable cause to search the information described in Attachment A for evidence of these crimes as further described in Attachment B.

## PROBABLE CAUSE

7. The United States, through the FBI's Central Virginia Violent Crimes Task Force (CVVCTF) has participated in a criminal investigation of two armed carjackings that occurred in Richmond City and in Chesterfield County, both within the Eastern District of Virginia.

8. On April 13, 2021, at approximately 1:00 pm, Richmond Police responded to the area of East 15th Street, Richmond, Virginia for a report of a carjacking. Victim #1 reported that he/she was at a location repairing a HVAC system. As Victim #1 was sitting in their work vehicle, an unknown black male approached the van and displayed and brandished a firearm. The suspect demanded the keys to the victim's vehicle, a Chevrolet Pickup Truck bearing a VIN ending in 7633. Victim #1 initially responded by telling the suspect, "I can't do that." The suspect responded by brandishing a firearm and pointing it directly at Victim #1's head as the subject walked closer to the victim. At that point, Victim #1 was in fear of being shot and complied with the demand by exiting the pickup truck. The suspect then got into Victim #1's pickup truck and drove away from the area. Officers were able to recover a Ring Doorbell Video which confirmed the carjacking incident as described herein.

---

[1] A Richmond, Virginia federal grand jury returned an indictment charging JACKSON with these crimes, therefore probable cause to believe he committed these crimes has already been found. See 3:21cr081-DJN.

3

9. At approximately 1:36 pm, while officers were still on the scene of the Richmond carjacking, Chesterfield Police advised them that a second carjacking had occurred at 2423 West Hundred Road, Chesterfield, Virginia (a Chipotle restaurant location). The suspect had approached Victim #2 as Victim #2 was getting into his/her vehicle (a Chevrolet Equinox SUV; registered in Virginia bearing VIN ending in 5723). The suspect ordered Victim #2 out of the car, further demanding that Victim #2 hand over the keys. Victim #2 initially said no, and the suspect then pointed a handgun with an extended magazine at Victim #2. In fear of being shot, Victim #2 relinquished the keys to the vehicle and ran to the front of the Chipotle Restaurant. The suspect got into Victim #2's vehicle and drove away from the area, getting onto Route 10 toward the I-95 South ramp.

10. Officers located Victim #1's Chevrolet Truck in the Chipotle restaurant's parking lot. This was the same vehicle that had been carjacked earlier as described herein. Victim #1's truck was in a parking space located next to where the Chevrolet Equinox SUV that had been carjacked from Victim #2.

11. Officers determined that the Chevrolet Equinox that had been carjacked from Victim #2 was equipped with OnStar, a GPS and safety device used in General Motors products. OnStar was contacted and was able to locate the vehicle traveling into Petersburg, Virginia. Contact was made with Petersburg Police Department to assist in stopping the vehicle. Police officers, coordinating with OnStar, were able to follow the Equinox and then have OnStar disable the vehicle in the area of Wythe Street and Interstate 95 in Petersburg, Virginia.

12. Petersburg Police approached Victim #2's vehicle and observed that the driver and only occupant of the vehicle was Treon JACKSON. After JACKSON was removed from the vehicle, officers located a Ruger Pistol, Model SR9c, 9mm firearm, bearing serial number 333-10960 under the front passenger seat. This firearm was loaded with 16 rounds of ammunition. Victim #2 advised that the firearm was not theirs, and further advised that prior to the carjacking, there was never a firearm in the SUV.

13. At the time of his arrest, JACKSON was wearing a black hoodie with red and white lettering and black jeans. This is the same clothing that the suspect was described as wearing during the Richmond City Carjacking, as well as during the Chesterfield County Carjacking.

14. The keys to Car #1 were also located in Car #2.

15. One cellular telephone was recovered from the front passenger floor between the seat and the driver's door of vehicle #2 (the Chevrolet Equinox SUV; registered in Virginia bearing VIN ending in 5723). Victim #2 confirmed that this cell phone did not belong to them. A second cellular telephone was recovered from JACKSON's person. The cell phone assigned call number (804) 546-6064, with IMEI# 352180108937578 is the SUBJECT PHONE referenced in this affidavit.

16. JACKSON was taken into custody and subsequently advised of his rights pursuant to *Miranda*. JACKSON signed a waiver and spoke with law enforcement. During the interview, JACKSON stated that he needed to get to Petersburg due to family issues. JACKSON was asked by detectives "You don't think you could have just rolled up on [Victim#1] and said give me the keys?" to which JACKSON replied, "That's all I did ... I mean that's all I said."

17. JACKSON also stated that he had left his car in the area of 15th and Maury Streets in Richmond, and identified the license plate on the car as having the letters UNL.

18. Detectives located a 2004 Cadillac with Virginia License plate UNL-88xx, which was registered to a female with the last name Jackson. This vehicle was parked on E. 15th Street in Richmond, VA. approximately one block from where the first carjacking occurred.

19. Based on my training and experience, individuals who commit robberies often communicate with others, including relatives or co-conspirators, to discuss the planning, execution, and/or the aftermath of the robberies, and they do so using their cellular telephones. Individuals may also utilize Internet searches before or after the robberies to determine the best getaway route.

20. Most significantly, cell phones are arguably the predominant way people communicate in modern society. With the advent of smartphone technology and all of the functions such devices offer, for many people, including those who commit robberies, the mobile phone has become as essential to have on their person as any item of clothing. Indeed, as Chief Justice John Roberts observed in Riley v. California, 573 U.S. 373 (2014), modern cell phones "are now such a pervasive and insistent part of daily life that the proverbial visitor from Mars might conclude they were an important feature of human anatomy."

21. In my training and experience, I have learned that **AT&T Corporation** is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records."

6

Cell-site data identifies the "cell towers" (*i.e.*, antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (*i.e.*, faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate location of the cellular telephone but is typically less precise than other types of location information, such as E-911 Phase II data or Global Positioning Device ("GPS") data.

22. Based on my training and experience, I know that **AT&T Corporation** can collect cell-site data about the SUBJECT PHONE. I also know that wireless providers such as **AT&T Corporation** typically collect and retain cell-site data pertaining to cellular phones to which they provide service in their normal course of business in order to use this information for various business-related purposes.

23. Based on my training and experience, I know that **AT&T Corporation** also collects per-call measurement data, which AT&T also refers to as "timing advance" data. Timing advance data estimates the approximate distance of the cellular device from a cellular tower based on the speed with which signals travel between the device and the tower. This information can be used to estimate the approximate location range that is more precise than typical cell-site data.

24. Based on my training and experience, I know that wireless providers such as **AT&T Corporation** typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the

7

subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless telephone service. I also know that wireless providers such as **AT&T Corporation** typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular phone and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the SUBJECT PHONE's user or users and may assist in the identification of co-conspirators and/or victims.

8

## AUTHORIZATION REQUEST

25. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

26. I further request that the Court direct **AT&T Corporation** to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control. Because the warrant will be served on **AT&T Corporation**, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

_____
Mark G. Jones
Special Agent
Bureau of Alcohol, Tobacco, Firearms, and
Explosives (ATF)

Subscribed and sworn before me on November 9, 2021
Richmond, Virginia

/s/ MRC
_____
Mark R. Colombell
United States Magistrate Judge

## ATTACHMENT A

## Property to Be Searched

This warrant applies to records and information associated with the cellular telephone assigned call number **(804) 546-6064**, with International Mobile Subscriber Identity **352180108937578** ("the Account"), that are stored at premises controlled by **AT&T Corporation** ("the Provider"), headquartered at 208 South Akard Street, Dallas, Texas 75202.

## ATTACHMENT B

### Particular Things to be Seized

**I.  Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A for the time period **April 13, 2021 12:00 AM to April 13, 2021 11:59 PM eastern daylight time (EDT).**

    a. The following information about the customers or subscribers of the Account:

        i. Names (including subscriber names, user names, and screen names);

        ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

        iii. Local and long distance telephone connection records;

        iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

        v. Length of service (including start date) and types of service utilized;

        vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

        vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

      viii. Means and source of payment for such service (including any credit card or bank account number) and billing records.

b. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Account, including:

    i. the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

    ii. information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received for the duration of the voice, SMS, or data communication, including handover cell towers and sectors and duration of use on each cell tower;

    iii. information regarding the location of AT&T Corporation's cell sites within the regional market(s) associated with the communications described above, including identifying cell site naming/numbering, location, and sector information; and

    iv. information regarding the estimated location of the cellular telephone, including latitude, longitude, and approximate range from the latitude and longitude provided, as retained in the Location Database of Record (LOCDBOR).

2

## II.     Information to be Seized by the Government

All information described above in Section I that constitutes evidence of violations of 18 U.S.C. § 2119, 18 U.S.C. §924 (c), and 18 U.S.C. §922 (g)(1) involving Treon C. JACKSON during the period April 13, 2021 12:00 AM to April 13, 2021 11:59 PM eastern daylight time (EDT).

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

# CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by AT&T Corporation, and my title is _____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of AT&T Corporation. The attached records consist of _____ **[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]**. I further state that:

a. all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of **AT&T Corporation**, and they were made by **AT&T Corporation** as a regular practice; and

b. such records were generated by **AT&T Corporation** electronic process or system that produces an accurate result, to wit:

1. the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of **AT&T Corporation** in a manner to ensure that they are true duplicates of the original records; and

2. the process or system is regularly verified by **AT&T Corporation**, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____     _____
Date                                                   Signature